## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| APRIL SCHUSTER, | CASE NO. 4:20-CV-02278-SL |
| Plaintiff, | JUDGE SARA LIOI |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

### INTRODUCTION

Plaintiff April Schuster filed a Complaint against the Commissioner of Social Security Administration ("Commissioner") seeking judicial review of the Commissioner's decision denying disability insurance benefits ("DIB"). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On October 8, 2020, pursuant to Local Civil Rule 72.2, this matter was referred to a Magistrate Judge for preparation of a Report and Recommendation, and was subsequently reassigned to me pursuant to General Order 2021-06. (Non-document entry dated May 25, 2021). Following review, and for the reasons stated below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** this matter for additional proceedings consistent with this Report and Recommendation.

1

## PROCEDURAL BACKGROUND

Ms. Schuster filed for DIB on December 31, 2017, alleging a disability onset date of September 30, 2017. (Tr. 68). Her claim was denied initially and on reconsideration. (Tr. 67-88, 90-111). She then requested a hearing before an Administrative Law Judge. (Tr. 133-34). Ms. Schuster (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on November 13, 2019. (Tr. 34-60). On December 2, 2019, the ALJ issued a written decision finding Ms. Schuster not disabled. (Tr. 12-33). The Appeals Council denied Ms. Schuster's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6; *see* 20 C.F.R. §§ 404.955, 404.981). Ms. Schuster timely filed this action on October 8, 2020. (ECF #1).

## FACTUAL BACKGROUND

### I.  ADMINISTRATIVE HEARING

The following summarizes the testimony of Ms. Schuster and VE Roxanne Benoit, presented during the hearing before the ALJ.

Ms. Schuster lives with her husband and seven children. (Tr. 42). At the time of the hearing, the children were between the ages of one and eleven years. (*Id.*). Ms. Schuster has a driver's license but only drives within a few minutes of her house because she gets lost. (Tr. 43). Ms. Schuster alleges she is unable to work due to memory issues, a problem that worsened after she underwent radiation therapy. (Tr. 46). Ms. Schuster relies on her husband, children, and mother for help to remember things. (*Id.*). She sets timers on her phone to remind herself to get each child up at the correct time to get on the bus. (*Id.*) ("If my timer doesn't tell me who and what, I don't remember.").

Ms. Schuster endorses back, leg, pelvic, and left-sided head pain. (Tr. 47). She has near-constant left leg numbness. (Tr. 52). When her right leg started to go numb, Ms. Schuster's doctor told her to use a cane for stability. (*Id.*). She has endured back pain for a long time, but it has become "tremendously worse." (Tr. 47). Bending or lifting anything heavy aggravates the pain. (Tr. 53). Ms. Schuster did not seek further medical treatment for her back pain after the administration of a nerve block left her unable to walk and bent at the waist in an "L" shape for six months. (*Id.*). To relieve pain, Ms. Schuster takes Tylenol, uses a heating pad, and lays with her head propped up to relieve the pressure. (*Id.*).

Ms. Schuster had headaches before September 2017, "but they were never like this." (Tr. 51). On a normal day, her headache, located behind her left ear, feels like "a semi-truck slamming in [her] head constantly." (Tr. 47, 48). She experiences these headaches three to four days a week. (Tr. 50). On her "bad and worst days it feels like there's a pitchfork attached to the semi-truck." (Tr. 49). At her worst, Ms. Schuster's headaches leave her vomiting and confined to her bed, feeling dizzy and barely able to move, unable to eat, and unable to get words out. (*Id.*). Sometimes, Ms. Schuster sounds as if she has had a stroke because she slurs her words or cannot talk for hours. (Tr. 47). A headache of this intensity occurs at least once a week. (Tr. 49).

Ms. Schuster has not discovered what triggers these intense headaches; however, she can sometimes anticipate a headache because she can feel the pressure building. (Tr. 50). When this happens, Ms. Schuster calls her mother to come over so she can lay down. (*Id.*). Ms. Schuster takes Tylenol almost every day in addition to migraine medications. (*Id.*). She takes pain medication on her bad days. (Tr. 51). Ms. Schuster takes over-the-counter medication each night to sleep, but even then, she usually only sleeps a couple hours because she wakes up in pain or crying. (Tr. 54).

On days Ms. Schuster does not have a headache, she is able to be more active. (Tr. 50). She can sweep the house and fold the laundry. (*Id.*). However, she uses a dustpan that does not require her to bend over, otherwise she blacks out. (*Id.*). Ms. Schuster's children help with the laundry – she folds the clothes, but the children put the folded laundry away because Ms. Schuster is unable to carry it. (*Id.*).

Ms. Schuster's two youngest children are home with her during the day. (Tr. 54). On her bad days, Ms. Schuster's mother, who lives a mile away, will care for the children. (*Id.*). Her mother also takes care of the shopping for Ms. Schuster. (Tr. 55).

Ms. Schuster has outfitted her bathroom with a shower seat and an elevated toilet seat, both equipped with handles to avoid falling over. (*Id.*).

Ms. Schuster met with therapist Kendra Beach to address symptoms of depression, including not eating and not wanting the leave the house. (Tr. 47, 53-54). Ms. Schuster saw Ms. Beach about once a week but stopped recently "because of the driving issues, the memory issues, and other health issues." (Tr. 47-48).

The VE then testified. She categorized Ms. Schuster's past relevant work as preschool teacher (DOT 092.227-018), Specific Vocational Preparation (SVP) 7, skilled, light. (Tr. 56). The ALJ asked the VE if a hypothetical individual of Ms. Schuster's age, education, and work history could perform Ms. Schuster's past relevant work under the following limitations: the individual is limited to sedentary work and can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance; occasionally stoop, kneel, crouch, and crawl; avoid all exposure to unprotected heights and moving mechanical parts; never operate a motor vehicle; avoid concentrated exposure to dust, odors, fumes, and pulmonary irritants; and is further limited to

4

simple, routine, and repetitive tasks with few changes in the work setting, but not at a production-rate pace; making simple work-related decisions; and occasionally interacting with supervisors, coworkers, and the public. (Tr. 56-57). The VE responded such a hypothetical individual could not perform Ms. Schuster's past relevant work. (Tr. 57). The VE then identified three jobs the individual could perform, including:

- Sorter (DOT 521.687-086), sedentary, unskilled, SVP 2, 19,000 jobs in the national economy;

- Final assembler (DOT 713.687-018), sedentary, unskilled, SVP 2, 17,000 jobs in the national economy; and

- Cable worker (DOT 739.687-182), sedentary, unskilled, SVP 2, 9,300 jobs in the national economy.

(Tr. 57). The same jobs remain available to an individual who requires a cane for ambulation. (*Id.*). But, an individual is precluded from competitive employment if she requires prompting or redirection from a supervisor or coworker on a daily basis. (Tr. 59).

The VE testified an employer will tolerate an individual being off task up to 15% of the workday and one or two absences a month. (Tr. 58).

## II.   PERSONAL AND VOCATIONAL EVIDENCE

Ms. Schuster was 33 years old at the time of her alleged onset date, and 35 years old at the time of the administrative hearing. (Tr. 67). Ms. Schuster completed high school and earned an associate degree in early childhood education. (Tr. 43, 45). In the past, Ms. Schuster has been employed as a dietary aide, a preschool teacher, and a server at Texas Roadhouse. (Tr. 43-45). In addition, Ms. Schuster answered the telephones for a newspaper. (Tr. 45).

III.    RELEVANT MEDICAL EVIDENCE

Ms. Schuster sought treatment for abdominal pain with accompanying nausea and
vomiting, low back pain, left leg weakness, headaches, depression and anxiety, and a schwannoma
at the left skull base.

**Abdominal pain.** In January 2013, a colonoscopy revealed several polyps, which were
removed. (Tr. 1210). Subsequent testing that year was negative, but Milan Dodig, M.D., felt Ms.
Schuster suffered from constipation-predominant irritable bowel syndrome or an alternative
source of pain, perhaps not GI-related. (Tr. 1213). In January 2017, Ms. Schuster returned to Dr.
Dodig for another colonoscopy. (Tr. 1215). Biopsy testing revealed mild chronic nonspecific
inflammation and hyperplastic changes but no colitis, irritable bowel disease, or malignancy. *Id.*

Between August 30, 2017 and April 27, 2019, Ms. Schuster went to the emergency
department no less than eight times with complaints of abdominal pain, nausea, vomiting, and
sometimes headaches. (Tr. 473, 497, 1027, 1308, 1305, 1404, 1419, 1571). Medical personnel
observed one of Ms. Schuster's unexpected vomiting spells on March 2, 2018, when she received
her first radiation treatment for the schwannoma. (Tr. 1008). During the last minute of the
procedure, Ms. Schuster reported a sharp, radiating pain from the left skull base and into the left
neck. (*Id.*). During post-procedure observation, Ms. Schuster received Motrin for her post-operative
headache. (Tr. 1009-10). At 11:50 a.m., Ms. Schuster was observed dry heaving, crying, and rolling
around, stating that her head pain had increased. (Tr. 1010). At 12:15 p.m., Ms. Schuster was
observed vomiting yellow-colored emesis and she complained of increasing left neck pain. (Tr.
1011). The nurse noted that Ms. Schuster was still retching and vomiting small amounts of yellow-

colored emesis at 1:20 p.m. *Id.* By 3:00 p.m., and after receiving medication, Ms. Schuster's nausea and neck pain eased, and she felt well enough to go home. (Tr. 1012).

In August 2018, one of Ms. Schuster's medical providers noted that Ms. Schuster's abdominal pain was likely psychologically related. (Tr. 1348).

**Back pain.** Ms. Schuster sought treatment for low back pain at Mercy Health's Youngstown Neurology office in March 2014. Results of imaging testing revealed some disc degeneration and a bulge at L4-L5. (Tr. 592). An MRI showed minimal left-sided radiculopathy and examination was indicative of peripheral neuropathy. (Tr. 593). Physical examination revealed diminished sensation and moderate decreased vibratory sensation in Ms. Schuster's legs. (Tr. 591). The advanced nurse practitioner and Dr. Tamulonis felt Ms. Schuster was doctor-shopping because she arrived with four different prescription bottles, one of which was a narcotic, from four different doctors. (Tr. 593).

Ms. Schuster saw Stephanie Kopey, D.O., in 2015 for treatment of back, neck, and ankle pain and headaches. (Tr. 773, 758). Ms. Schuster also complained of left leg weakness. (Tr. 768). She underwent an electromyography examination that was "essentially normal" but decreased activation was observed in Ms. Schuster's left leg muscles. (Tr. 766). The examination interpreter noted that decreased activation can indicate pain at the needle site, decreased cooperation, central nervous system disease, or functional disorder, but reported that Ms. Schuster was cooperative and did not report pain during the examination. (*Id.*). Updated spine imaging showed minimal bulging discs at L3-L4, L4-L5, and L5-S1; unchanged disc desiccation at L4-L5, and L5 endplate degenerate changes. (Tr. 745).

At the end of January 2016, Ms. Schuster saw Dr. Tamulonis's nurse again. (Tr. 753). Physical examination was normal except Ms. Schuster had decreased sensation in her lower extremities. (Tr. 756). Ms. Schuster stood unassisted, appeared steady, and did not have a limp when she was distracted. (*Id.*). The nurse noted that she suspected Ms. Schuster was embellishing in 2014 and continued to suspect the same. (Tr. 757).

In March 2016, Ms. Schuster saw Dr. Kopey and complained of left knee pain. (Tr. 748). In June 2016, Ms. Schuster saw Dr. Tamulonis. (Tr. 743). The physical examination was normal but Dr. Tamulonis noted that Ms. Schuster walked with a "questionable antalgic gait—favoring her left knee." *Id.* In July 2016, Ms. Schuster underwent surgery for repair of her left knee chondromalacia patella. (Tr. 728, 736).

Ms. Schuster continued to see Dr. Kopey for low back pain and left leg weakness. (Tr. 694-97, 702-13, 717-19). She often exhibited diminished sensation at the left lateral leg and diminished ankle dorsiflexion. (Tr. 696, 719, 1665). An updated electromyography study was essentially normal but showed decreased activation in the left leg muscles. (Tr. 703). An updated MRI from February 2018 revealed degenerative changes at L3-L4 and L4-L5, resulting in canal stenosis and neural foraminal stenosis, and a lesion within the right superior lateral L5 vertebral body. (Tr. 1142, 1166).

**Headaches.** On January 8, 2016, Ms. Schuster complained of daily headaches that last several hours, associated with photo- and phonophobia and nausea. (Tr. 758). Dr. Kopey ordered migraine medications. (Tr. 760). Dr. Kopey continued to treat Ms. Schuster for her migraines through increased prescription dosages and changes to medication (Tr. 702-13, 725-27, 748-50)

8

In December 2017, a brain scan revealed a left skull base tumor. (Tr. 700-01). Ms. Schuster met with neurosurgeon Daraspreet Kainth, M.D., to discuss the tumor and her persistent headaches. (Tr. 697). Ms. Schuster complained of memory loss, focal weakness, and headaches. (Tr. 699). Physical examination revealed that Ms. Schuster's tongue deviated to the left and that she had weakness in her left lower extremity. (Tr. 700). Dr. Kainth referred Ms. Schuster for skull base surgery at the Cleveland Clinic. (*Id.*).

On January 16, 2018, Ms. Schuster met with Pablo Recinos, M.D., to discuss the tumor and treatment options. (Tr. 927). Dr. Recinos determined the tumor was likely a lower cranial nerve schwannoma associated with tongue atrophy, deviation, hoarse voice, and decreased gag reflex on the left side. (*Id.*). Dr. Recinos did not believe the tumor was the source of Ms. Schuster's headaches or her left leg symptoms. (Tr. 927, 1080). Physical examination revealed decreased lower left extremity strength, range of motion, and sensation. (Tr. 930). On March 2, 2018, Ms. Schuster received her first dose of radiation therapy. (Tr. 1131). During a post-operative follow-up, Ms. Schuster noted that her left-sided headache and left leg weakness persisted, and she was taking regular oxycodone. (Tr. 1155). The doctor noted good memory, attention span, and concentration, but decreased left shoulder shrug, decreased strength in Ms. Schuster's left lower extremity, and myotatic reflexes. (Tr. 1156). A brain MRI showed the schwannoma caused anterior displacement of the left carotid artery. (Tr. 1157).

In July 2019, a component of Ms. Schuster's tumor had decreased in size, though displacement of the carotid sheath remained. (Tr. 1659). Ms. Schuster reported increased depression with loss of attention, impairment in working memory, and spatial disorientation; difficulty sleeping; generalized weakness; and apathy. (Tr. 1663). Her provider opined that Ms.

9

Schuster's symptoms may be reactive to her medical issues and additional pressures, such as taking care of seven children. (*Id.*). On questioning, the doctor noted Ms. Schuster had good remote memory but had problems with working memory and spatial orientation and showed impaired attention span and concentration. (Tr. 1665). Ms. Schuster had decreased sensation in her lower limbs and myotatic reflexes. (*Id.*).

## IV.    MEDICAL OPINIONS

State agency medical and psychological consultants reviewed the medical and other evidence at the initial and reconsideration levels. The medical consultant at the initial level determined Ms. Schuster could lift and carry up to twenty pounds occasionally, ten pounds frequently; stand and walk for four hours; sit for about six hours; and, due to baseline weakness, diminished sensation, and diminished ankle dorsiflexion in her left lower extremity, was restricted from using left-sided foot controls. (Tr. 82). The medical consultant further opined Ms. Schuster could occasionally climb ramps and stairs; occasionally stoop, kneel, crouch, and crawl; frequently balance; never climb ladders, ropes, or scaffolds; and must avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation, and all exposure to hazards such as heights and machinery. (Tr. 82-83). Due to Ms. Schuster's slowed, slurred speech and occasional hoarse voice, the medical consultant limited her to occasional interaction with the public. (Tr. 83).

The psychological consultant determined Ms. Schuster was moderately limited in the following abilities: understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention and concentration for extended periods; working in coordination with others without being distracted; completing a normal workday and week without interruptions from psychologically based symptoms and performing at a consistent pace

10

without an unreasonable number and length of rest periods; interacting appropriately with the general public; getting along with coworkers or peers without distracting them; and responding appropriately to changes in the work setting. (Tr. 84-86). This consultant opined Ms. Schuster retained the ability to understand and remember one- to three-step tasks; carry out routine work functions, but not at a production rate pace; interact with coworkers, supervisors, and the general public on a superficial basis; and complete tasks in a static environment, where changes are infrequent and well-explained. (Tr. 84-86).

On reconsideration, the medical and psychological consultants adopted the findings made at the initial level, finding them consistent with and supported by the evidence, including the updated records. (Tr. 106, 108).

Ms. Schuster attended a consultative examination with Jennifer Haaga, Psy.D., in connection with a prior application for DIB. Ms. Schuster saw Dr. Haaga on June 16, 2016, more than a year before Ms. Schuster's current alleged onset date. (Tr. 447). Dr. Haaga's evaluation consisted of a clinical interview with Ms. Schuster and review of one encounter report from Ms. Schuster's therapist and one report of contact with the Agency. (*Id.*). Dr. Haaga did not conduct psychological testing during the interview. (Tr. 452).

Dr. Haaga noted that Ms. Schuster appeared disheveled and tired, and had difficulty standing and walking after the interview. (Tr. 450). Ms. Schuster was cooperative and readily volunteered information and details. (*Id.*). She spoke slowly, articulated clearly, and had logical, organized, coherent, and goal-directed thought processes. (*Id.*). Ms. Schuster denied previous depressive symptoms and attributed her feelings to "not being able to do what I used to do and not

11

run around with my kids." (*Id.*). Ms. Schuster also endorsed symptoms of anxiety, agoraphobia, and panic disorder. (Tr. 451).

Dr. Haaga felt Ms. Schuster's cognitive functioning was in the low average range of ability. (*Id.*). She deemed adequate Ms. Schuster's attention, concentration, and ability to abstract. (Tr. 452). Though Ms. Schuster reported difficulties with recent memory functioning, she did not demonstrate any such difficulties during the evaluation. (*Id.*).

Dr. Haaga opined that Ms. Schuster retained the ability to comprehend and complete simple, routine tasks. (Tr. 453). The doctor noted that Ms. Schuster could maintain attention, concentration, persistence, and pace but that her symptoms, specifically when demands become too great, will make many tasks more difficult. (*Id.*). Dr. Haaga noted Ms. Schuster's interaction during the examination was adequate. (Tr. 454). Ms. Schuster reported leaving several jobs after arguing with others. (*Id.*). Dr. Haaga opined Ms. Schuster would likely have increased symptoms when responding to work pressures. (*Id.*).

In August 2018, Ms. Schuster underwent a second psychological evaluation. (Tr. 1191). J. Joseph Konieczny, Ph.D., conducted a clinical interview, reviewed treatment notes from Ms. Schuster's therapist, and conducted the Wechsler Adult Intelligence Scale-V and the Wechsler Memory Scale IV. (*Id.*).

During the interview, Ms. Schuster endorsed symptoms of depression for four or five years, pegging them to the onset of her medical issues. (Tr. 1192). Ms. Schuster reported significant light sensitivity, daily crying episodes and that she does not like to leave the house anymore. (*Id.*). Dr. Konieczny noted Ms. Schuster kept her eyes closed throughout the majority of the interview. (Tr. 1193). Ms. Schuster stated her doctors found a brain tumor in 2017, for which she underwent

radiation surgery, and continues to be monitored. (Tr. 1192). Ms. Schuster related significant

memory deficits since her diagnosis, along with frequent dizziness and left-sided numbness. (*Id.*).

Ms. Schuster also reported minimal participation in daily household activities. (*Id.*). She

reported waking up, vomiting all morning, trying to do some chores, and attending to her children

in the afternoon. (*Id.*). She otherwise rests on the couch. (*Id.*). Another family member will prepare

dinner. (*Id.*). Following dinner, Ms. Schuster interacts with her family before going to bed. (*Id.*).

As to sensorium and cognitive functioning, Dr. Konieczny observed indications of

impairment in Ms. Schuster's ability to concentrate and attend to tasks. (Tr. 1193). He also

observed deficits in Ms. Schuster's overall level of judgment. (*Id.*). The Wechsler Adult Intelligence

Scale-V revealed a full-scale IQ score of 55, "placing her well within the extremely low range of

adult intellectual functioning." (Tr. 1194). Subtests indicated Ms. Schuster had particular deficits

in the areas of attention and concentration, auditory imagery, and retentiveness. (*Id.*). Her

strengths were in the areas of verbal concept formation, range of information, and old learning

and memory. (*Id.*) The Wechsler Memory Scale IV revealed significant visual memory, visual

working memory, and delayed memory deficits. (*Id.*). Dr. Konieczny noted that Ms. Schuster's

scores were significantly lower than expected given her overall level of functioning. (*Id.*).

Dr. Konieczny opined Ms. Schuster suffered from a very significant and global memory

decline and, as a result, Ms. Schuster would have limitations in her ability to understand,

remember, and carry out instructions; difficulty maintaining focus and persistence on mild to

moderately complex multi-step tasks; and diminished tolerance for frustration and diminished

coping skills, which would impact her ability to respond to supervision and interaction in the

workplace as well as her ability to respond to pressure in a work setting. (Tr. 1195). Dr. Konieczny

diagnosed Ms. Schuster with Major Neurocognitive Disorder, and noted that he based his conclusion on Ms. Schuster's reported tumor and surgery, education and vocational history, and test scores. (Tr. 1194). He also diagnosed Ms. Schuster with Major Depressive Episode, single episode, severe, with anxious distress. (Tr. 1195).

## V.   OTHER RELEVANT EVIDENCE

Ms. Schuster's therapist, Kendra Beach, completed a Mental Status Questionnaire and a Daily Activities Questionnaire for the state agency Division of Disability Determination, dated September 27, 2018. (Tr. 1199-1200). Ms. Beach saw Ms. Schuster between January 28, 2016 and August 9, 2018. (Tr. 1199). Ms. Beach noted depressed and anxious mood, moderately impaired cognitive functioning, moderate-to-severe symptomology, and diagnoses of depression and anxiety. (Tr. 1199-1200). She noted Ms. Schuster's participation in household activities was limited and that Ms. Schuster relied on her husband, children, and mother to help her with food preparation, household chores, and shopping. (Tr. 264). She opined Ms. Schuster was moderately impaired in her abilities to remember, understand, and follow directions; maintain attention; sustain concentration, persist at tasks, and complete them in a timely fashion; and social interaction. (Tr. 1200). Ms. Beach felt Ms. Schuster's high need for rest, low stress tolerance, and cognitive and pain issues prevented Ms. Schuster from engaging in work activities. (Tr. 263). She concluded that Ms. Schuster would be unable to tolerate any work at that time. (Tr. 1200).

## THE ALJ'S DECISION

The ALJ's decision, dated December 5, 2019, included the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through September 30, 2021.

14

2.    The claimant has not engaged in substantial gainful activity since September 30, 2017, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.    The claimant has the following severe impairments: Lumbar degenerative disc disease and facet arthropathy, with radiculopathy/neuritis/polyneuropathy; chondromalacia patella and osteoarthritis of the left knee, status post repair of left medial meniscus tear; obesity; asthma; GERD with histories of esophageal dilation and IBS; left skull base/vestibular schwannoma, status post gamma knife therapy; and affective and cognitive dysfunction diagnosed to include adjustment, depressive, anxiety, stressor-related, learning/neurodevelopmental, and neurocognitive disorders (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.    The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a), with the following limitations: The claimant can never climb ladders/ropes/scaffolds, she can never work at unprotected heights or near moving mechanical parts, she cannot operate a motor vehicle, and she must avoid concentrated exposure to dusts, odors, fumes, gases, poor ventilation, and similar respiratory irritants. The claimant can occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl, and she can frequently balance. Mentally, the claimant can perform simple, routine, repetitive tasks, but not at a production rate pace; she can make simple work-related decisions, she can occasionally interact with supervisors, coworkers, and the general public, and she can tolerate few changes in a routine work setting.

6.    The claimant is unable to perform past relevant work (20 CFR 404.1565).

7.    The claimant was born on February 13, 1984; therefore, she was 33 years old and defined as a younger individual, age 18-44, on the alleged disability onset date (20 CFR 404.1563).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has

transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from May 3, 2017, the amended alleged onset date, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 17-27).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477

16

(6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner

follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## LAW AND ANALYSIS

Ms. Schuster claims the ALJ did not properly analyze her complaints of pain in accordance with Social Security Ruling 16-3p, and, as a result, the ALJ's determination that Ms. Schuster can perform sedentary work is not supported by substantial evidence. (Pl.'s Br., ECF #17, PageID 1814). Ms. Schuster argues the ALJ did not consider the necessary factors in evaluating the

intensity, persistence, and limiting effects of an individual's symptoms (*see, e.g.,* SSR 16-3p) and did not articulate valid reasons for finding her symptoms inconsistent with the evidence. (Pl.'s Br., ECF #17, PageID 1818-19). She claims that much of the evidence the ALJ relied on was irrelevant to the disability determination. (*Id.* at PageID 1815-18).

In response, the Commissioner maintains the ALJ properly evaluated Ms. Schuster's symptoms. (Comm'r's Br., ECF #19, PageID 1830). It argues the ALJ considered "a number of factors under SSR 16-3p" including "the objective medical evidence, [Ms. Schuster's] subjective statements, as well as the state agency psychologists' opinions during the relevant period when determining that Ms. Schuster was not as limited as she claimed." (*Id.* at 1833).

An adjudicator follows a two-step process for evaluating an individual's symptoms. In step one, the adjudicator determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p. In step two, the adjudicator evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.*

Acknowledging that some individuals may experience symptoms differently and may be limited to a greater or lesser extent than others with the same impairments, the Commissioner instructs its adjudicators to examine the entire case record in considering the intensity, persistence, and limiting effects of an individual's symptoms, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case file. *Id.* The Commissioner also clarifies that subjective symptom evaluation is not an examination of an individual's character. *Id.*

19

Objective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms, including the limiting effects those symptoms may have on the ability to perform work-related activities. *Id.* The Commissioner directs its adjudicators to consider whether an individual's statements about her symptoms are consistent with the medical signs and lab findings of record. *Id.* Recognizing that symptoms cannot always be measured objectively, adjudicators will not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged. *Id.* Minimal or negative findings or inconsistences in the objective medical evidence is just one of many factors the adjudicator must consider. *Id.*

If a fully favorable disability determination cannot be made based solely on objective medical evidence, adjudicators consider other evidence, including statements from the individual, medical sources, and other sources with information about the individual's symptoms, including agency personnel. *Id.* The individual's statements about the intensity, persistence, and limiting effects of symptoms are evaluated for consistency with objective medical evidence and other evidence, including the individual's own statements made in different contexts. *Id.*

Adjudicators must also consider the factors set forth in 20 C.F.R. § 404.1529(c)(3) when evaluating the intensity, persistence, and limiting effects of an individual's symptoms. *Id.* Those factors include:

- Daily activities;

- The location, duration, frequency, and intensity of pain or other symptoms;

- Factors that precipitate and aggravate the symptoms;

- The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

- Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;

- Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

- Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3). Adjudicators are instructed to discuss all the factors pertinent to the evidence of record. Cherry-picking select portions of the medical record to discredit an individual's complaints of pain is not enough; the factors must be considered. *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013).

If an individual's statements about the intensity, persistence, and limiting effects of symptoms are consistent with one another and consistent with objective medical evidence and other evidence in the record, the adjudicator will determine that an individual's symptoms are more likely to reduce his capacities for work-related activities. SSR 16-3p.  The SSR cautions, however, that "inconsistencies in an individual's statements made at varying times does not necessarily mean they are inaccurate. Symptoms vary in their intensity, persistence, and functional effects, or may worsen or improve with time." *Id.*

The adjudicator's determination "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.* The adjudicator will explain which symptoms he found consistent or inconsistent with the evidence of record. *Id.* In addition, the evaluation must be limited

21

to the individual's statements about his or her symptoms and the evidence in the record that is relevant to the individual's impairments. In evaluating an individual's symptoms, our adjudicators will not assess an individual's character for truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person.

*Id.*

An ALJ's determination of subjective evidence receives great deference on review. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). This Court must accord great weight and deference to the ALJ's opinion of subjective evidence, due to the ALJ's opportunity to observe a claimant's demeanor during the hearing—an opportunity this Court is not afforded in its review. *Jones*, 336 F.3d at 476. Absent compelling reason, this Court may not disturb the ALJ's analysis of the claimant's subjective complaints and the conclusions drawn from it. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019).

Here, the ALJ found Ms. Schuster's medically determinable impairments could reasonably be expected to produce the types of symptoms alleged, but concluded that the asserted intensity, persistence, and limiting effects of those symptoms lacks record support. (Tr. 21). "A review of the record, however, generally indicates that the claimant's reported symptoms and difficulties tend to lack objective corroboration or other record support." (*Id.*).

The ALJ began his evaluation by summarizing Ms. Schuster's educational records and the daily activities and hobbies she endorsed when she was a teenager. (Tr. 21). The ALJ concluded that Ms. Schuster's current complaints about short-term memory issues were inconsistent with Stanford-Binet testing results, completed when Ms. Schuster was seventeen years old, that reflected an average ability to learn and sufficient attention span to complete tasks and perform at a consistent pace. (Tr. 21). The ALJ did not explain how test results and daily activities from nearly

22

two decades ago are pertinent to the required examination of Ms. Schuster's current abilities, especially in light of evidence consistent with her complaints, including Dr. Haaga's opinion that Ms. Schuster's symptoms from depression and anxiety would cause deficits in attention span, concentration, and memory if stress became too great; the results of the Wechsler Memory Scale-IV revealing significant memory deficits; and one of Ms. Schuster's most recent treatment notes showing that, on questioning, the doctor treating Ms. Schuster's brain tumor noted good remote memory but had problems with working memory and spatial orientation, and exhibited attention span and concentration deficits, consistent with Ms. Schuster's reported symptoms.[1]

In assessing Ms. Schuster's complaints of abdominal pain, nausea, and vomiting, the ALJ noted that medical providers were unable to determine the source of her pain. (Tr. 21, 24). When discussing her complaints of abdominal pain and headaches between June 2016 and September 2017, the ALJ noted the treatment records do not indicate that Ms. Schuster was unable to drive herself to her appointments. (Tr. 24). But the ALJ did not explain how driving herself to medical appointments was inconsistent with her reported symptoms. (*See id.*).

The ALJ also discounted Ms. Schuster's abdominal complaints because she was able to take her mother to doctor's appointments and could care for her disabled husband. (*Id.*). I note that the record contains a single reference to Ms. Schuster canceling an appointment to take her mother to a doctor's appointment. (Tr. 720). The ALJ did not explain how any of these activities was inconsistent with complaints of abdominal pain.

---

[1]     The ALJ's written decision addressed Dr. Haaga's opinion but did not consider the Wechsler memory test results or the examination findings in the referenced treatment note. (*See* Tr. 23-24).

The ALJ did not address the fact that Ms. Schuster's abdominal symptoms resulted in her visiting the Emergency Department eight times in less than three years. Also, although the ALJ notes "While undergoing gamma knife radiation treatment of her schwannoma, the claimant 'started dry heaving, stating pain in head [had] increased, crying and rolling around . . . [and] at time hyperventilating,' and post-operatively the claimant voiced complaints of vision and hearing deficits" (Tr. 25), he did not otherwise address those medical personnel observations from the post-operative medical providers. As detailed earlier in this opinion, those observations include that Ms. Schuster vomited for at least an hour thereafter and felt well enough to leave only after receiving several medications, all of which was relevant to Ms. Schuster's complaints of unexplained abdominal pain, nausea, and vomiting. The failure to discuss those observations is significant, especially where the ALJ's incomplete description of the event may intimate that Ms. Schuster feigned medical distress during radiation treatment. I note here that the ALJ's timeline is inaccurate – Ms. Schuster reported pain during the last minute of radiation treatment and reported increased pain after the procedure. The dry heaving and subsequent vomiting occurred after the procedure. (*See* Tr. 1008-12).

In assessing Ms. Schuster's complaints of headache pain, the ALJ noted her diagnosis of intractable migraines and that she received prescriptions for treatment in January 2016 (Tr. 23), and the neurosurgical specialist's doubt that the schwannoma caused Ms. Schuster's headaches. (Tr. 24). The ALJ did not address the multiple medication changes due to ineffective pain relief, the consistency with which Ms. Schuster complained of headaches, nor any other factor required under the regulations. Because he focused solely on evidence inconsistent with Ms. Schuster's

complaints, while failing to address any of the evidence supporting her statements, the ALJ erred

in his evaluation.

In addition to not adequately articulating his conclusions about Ms. Schuster's complaints,

the ALJ found inconsistency where there was none. (*See* Tr. 24). The ALJ took issue with two

statements, made over a year apart, about Ms. Schuster's involvement in her children's activities:

In June 2016, Ms. Schuster explained that her involvement in school activities was sitting and

directing people in the halls, whereas in November 2017, the ALJ noted "she did not describe her

involvement in school activities as limited to sitting and giving directions, but instead, that she

enjoyed watching her children play sports." (Tr. 24). The ALJ did not articulate how these two

activities, both involving limited movement and effort, contradict Ms. Schuster's complaints of

pain.

In conclusion, the ALJ erred in evaluating Ms. Schuster's complaints and their limiting

effects. While an ALJ is not required to address every piece of evidence in the record, he must still

articulate how he came to his conclusions. Here, the ALJ did not consider or address the factors

pertinent to symptom evaluation, cherry-picked the record to discredit Ms. Schuster's complaints

without addressing the evidence supporting Ms. Schuster's statements, did not build an accurate

and logical bridge between the evidence and his conclusions, and did not articulate his conclusions

so as to permit meaningful review or allow this Court to trace the path of his reasoning.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I

recommend the District Court **REVERSE** the Commissioner's decision denying disability

insurance benefits and **REMAND** this matter for additional proceedings consistent with this Report and Recommendation.

Dated: January 7, 2022.

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

### OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).